759 S.E.2d 160

**The STATE, Respondent,**

v.

**Henry GRAY, Appellant.**

Appellate Case No. 2012–209426.

No. 5240.

Court of Appeals of South Carolina.

Heard May 13, 2014.
Decided June 11, 2014.

602

Appellate Defender David Alexander, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, Senior Assistant Attorney General W. Edgar Salter, III, and Solicitor Daniel Edward Johnson, all of Columbia, for Respondent.

FEW, C.J.

The State indicted Henry Gray for murder and first-degree lynching, and the jury convicted him of both charges. Gray argues the trial court erred by not excluding graphic autopsy photographs under Rule 403, SCRE. We find the trial court acted within its discretion, and affirm.[1]

## I. Facts and Procedural History

On the afternoon of February 13, 2010, Kenneth Mack was severely beaten during the course of two fights. The first fight occurred on McDuffie Street near Gonzales Gardens—a public housing complex in Columbia consisting of thirty apartment buildings. The second fight occurred moments later between two buildings in Gonzales Gardens. Mack died several days later from injuries he received during the fights.

Multiple eyewitnesses testified to the details of the two fights. According to their accounts, Gray and his co-defendant Robin Reese, who is also his sister, were involved only in the second fight. They were both charged with murder and first-degree lynching. The following testimony was presented at their joint trial.

---

1. Gray also appeals the trial court's refusal to charge involuntary manslaughter. Gray's trial counsel asserted no argument in support of an involuntary manslaughter charge but simply told the court, "I made some ... requests for charges, if you would please deny those on the record, I would appreciate it." We decline to address this issue because we find it is not preserved for our review. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003) ("[F]or an issue to be preserved for appellate review, it must have been raised to and ruled upon by the trial judge."); *Gilchrist v. State*, 364 S.C. 173, 178, 612 S.E.2d 702, 705 (2005) (finding "trial counsel's submission of the request to charge, without any further explanation of his point, was insufficient to preserve [his argument] for review" because "[w]hen given the opportunity, counsel must articulate a reason for the requested charge").

## A. Testimony Regarding the First Fight

Issac Weathers, who lived in Gonzales Gardens, testified the first fight began when Mack and a "young lady," later identified as Reese's thirteen-year-old daughter and Gray's niece, started "arguing ... and they fell" to the ground. Weathers testified that after they fell, "a bunch of guys went and jumped on [Mack]" and began attacking him.

Amber Hardy testified she called 911 when she witnessed four men and a girl "beating up [Mack]." She described the fight as "brutal" and claimed the group members "took turns" kicking and punching Mack. Hardy testified that after the fight ended, Mack stood up and walked away, but was unsteady on his feet and kept "reaching out to ... brace himself."

Two men involved in the first fight—Marcellius Brooks, who lived in Gonzales Gardens, and Angelo Boyd, who lived in a house next to Gonzales Gardens—testified they were walking down McDuffie Street when they saw Reese's daughter arguing with Mack. Brooks claimed that when Mack "pick[ed her] up and slam[med] her to the ground," Brooks "tackled [Mack] off her." Brooks admitted hitting Mack twice with a "closed fist," but denied kicking him and stated no one else was involved in the fight. Boyd admitted kicking Mack once, and stated Reese's daughter hit him "a couple times," but similarly denied that anyone else was involved. Both testified that after the fight, Mack got up and ran toward Gonzales Gardens.

## B. Testimony Regarding the Second Fight

Reese, who lived in Gonzales Gardens, testified she learned about the assault on her daughter shortly after it occurred and became upset. Although Reese initially denied calling Gray, she later admitted she called Gray and told him "some grown man [was on] my daughter." She then decided to search for the man who attacked her daughter. According to Reese, she discovered Mack lying on the ground in front of her father's apartment building in Gonzales Gardens. Reese testified she "tried to kick [Mack] but [she] slipped and fell." She then "reached over and slapped him across his face and told him 'you stay away from my kid.'" At that point, Gray arrived and

pulled her off Mack and told her "let the police handle it." She testified she was still angry, so she grabbed a chair, which other witnesses described as a "metal lawn chair," and "slung it" at Mack, although "[i]t didn't even come in contact with his body."

Several eyewitnesses described the second fight much differently.[2] Donnetti Perry, who lived in Gonzales Gardens, testified he saw Gray and Mack talking in front of the building where Gray and Reese's father lived. According to Perry, Gray received a phone call during this conversation, and when he hung up, Gray "swept [Mack's] feet out from under him," causing him to fall and hit his head on the ground. He claimed Gray kicked Mack "all over" and yelled, "[W]hat [did] you do to my niece?" He testified Reese arrived at that point and said to Gray, "[T]hat's him," and started kicking Mack and yelling, "I'm going to teach you for messing with my daughter." He claimed Reese then "got [the] chair and hit him" two or three times, and Gray also hit Mack with the chair a couple of times. Perry testified Mack remained on the ground throughout the fight and did not "resist" or otherwise defend himself.

Kara Chase, who was staying with a friend in Gonzales Gardens, gave a statement to police shortly after the second fight. In this statement, which was introduced into evidence, she claimed Gray "swept [Mack] from under his feet causing [him] to hit his head on the pavement." Afterward, Reese "[ran] up the street saying 'that's him'" and "kick[ed] [Mack] repeatedly, picking up an old metal chair and throwing it on top of [him]." Gray "continued to kick and stomp [Mack] in his face," and Mack "laid on the ground the whole time this was occurring." At trial, however, Chase testified to a different version of events. She denied Gray kicked Mack's legs out from under him, or that Reese hit Mack with the metal chair. She also claimed Mack got up during the fight and did not remain on the ground the entire time.

## C. Medical Testimony

The State called Dr. Bradley Marcus, the pathologist who performed Mack's autopsy, as an expert witness. During Dr.

---

2. Gray did not testify at trial.

Marcus's testimony, the State offered into evidence eleven photographs taken before and during the autopsy. Both Gray and Reese objected to the admission of the photos under Rule 403, SCRE, arguing the danger of unfair prejudice substantially outweighed their probative value. After a hearing outside of the jury's presence, the trial court admitted the photos.

Dr. Marcus continued his testimony and relied on the photos to describe Mack's injuries to the jury. He testified "the cause of death was a closed head injury due to blunt head trauma." He explained that during the autopsy, he discovered Mack suffered a skull fracture to the back right side of his head and had "a massive amount of subdural hemorrhage" where the skull fracture was located. He testified this was "a significant injury" and the "ultimate cause of death." Although he could not determine if the fatal injury occurred during the first or second fight, Dr. Marcus testified the brain injury was consistent with someone "having their feet swept out from under them and landing on their head."

Gray and Reese each called forensic pathologists to testify regarding Mack's death. Both pathologists agreed with Dr. Marcus's testimony that blunt force trauma caused Mack's death. However, Gray's pathologist, Dr. Adel Shaker, commented on the thoroughness of the autopsy, stating it "was a hospital autopsy, not a forensic one," and explained "there is a great difference" between the two in regard to the level of detail. While Dr. Shaker did not know whether the first or second fight caused Mack's skull fracture, he stated, "[A]ll of the attacks that [Mack] experienced earlier ... [left] an impact" and ultimately caused "the final result"—death. Dr. Shaker further testified a person could receive fatal head injuries and experience a "lucid interval," during which the person may "be unsteady on [his] feet" but can otherwise "walk, talk, [and] do regular activities for a few minutes" before succumbing to his injuries. He testified Mack could have suffered a fatal brain injury during the first fight and experienced a lucid interval at the time of the second fight, which caused him to "los[e] his balance, and hit his head."

In reply, the State called Dr. Clay Nichols, the chief medical examiner for Richland County at the time of Mack's death, to refute Dr. Shaker's testimony casting doubt upon the reliabili-

ty of the autopsy. Dr. Nichols also testified he believed Mack's skull fracture occurred during the second fight when "[Mack] fell and hit the concrete."

### D. Verdicts and Sentencing

The jury found Gray and Reese guilty of murder and first-degree lynching.[3] The trial court sentenced them to thirty years in prison for each conviction, with the sentences to run concurrent.

## II. Admission of Autopsy Photos

Gray contends the trial court erred in admitting the autopsy photos. He argues the court should have excluded them under Rule 403, SCRE because their probative value was substantially outweighed by the danger of unfair prejudice. *See* Rule 403, SCRE (stating relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice").

### A. Standard of Review

"The admission of evidence is within the circuit court's discretion and will not be reversed on appeal absent an abuse of that discretion." *State v. Dickerson,* 395 S.C. 101, 116, 716 S.E.2d 895, 903 (2011). "A trial court has particularly wide discretion in ruling on Rule 403 objections." *State v. Lee,* 399 S.C. 521, 527, 732 S.E.2d 225, 228 (Ct.App.2012); *see also State v. Dial,* 405 S.C. 247, 260, 746 S.E.2d 495, 502 (Ct.App.2013) ("A trial judge's decision regarding the comparative probative value and prejudicial effect of relevant evidence should be reversed only in exceptional circumstances." (citation omitted)); *State v. Adams,* 354 S.C. 361, 378, 580 S.E.2d 785, 794 (Ct.App.2003) ("We . . . are obligated to give great deference to the trial court's judgment [regarding Rule 403]." (internal citation omitted)). In exercising its discretion on a Rule 403 objection to the admissibility of autopsy photographs, the trial court "must balance the [unfair prejudice] of

---

3. The former crime of lynching was defined in section 16–3–210 of the South Carolina Code (2003). The section was amended effective June 2, 2010 and redefined first-degree lynching as "assault and battery by mob in the first degree." S.C.Code Ann. § 16–3–210(B) (Supp.2013).

graphic photos against their probative value." *Dial,* 405 S.C. at 260, 746 S.E.2d at 502 (citation omitted).

## B. Description of the Photos

■ There are eleven autopsy photos at issue in this appeal. Eight of these—Exhibits 51 through 57 and 82—were taken before the autopsy began and show Mack's external injuries to his face, back, and legs. It was important for the jury to see the nature and location of these injuries in order to understand the witnesses' testimony about the fights and the pathologists' testimony about the injuries. These eight photographs contain no blood or gory anatomical details, and thus pose little, if any, danger of unfair prejudice. Because Exhibits 51 through 57 and 82 had high probative value and minimal danger of unfair prejudice, it was clearly within the trial court's discretion to admit them.

■ The other three photos—Exhibit 80, 81, and 83—were taken during the autopsy and show Mack's exposed skull and brain. Exhibit 81 is a side view of Mack's head that shows his inside-out scalp pulled down over his face. At first glance, it appears Mack is wearing a mask over his face. In explaining what the viewer sees in Exhibit 81, Dr. Marcus testified:

> The way we do the head is ... we make an incision along the back of the scalp here.... We pull the scalp over this way. You just literally just pull it over [the face] and that's what you're actually seeing here.

Exhibit 83 is a side view of Mack's exposed brain protruding from his open skull after the top part of his skull—referred to as the "skull cap"—was cut off. A gloved hand is holding the sawed-off skull cap, which is filled with blood on one side. Exhibit 80 is a close-up image of the hand holding Mack's skull cap, showing the details of the inside of his skull. The remainder of our discussion focuses on whether the trial court acted within its discretion to admit these three photos.

## C. Probative Value

■ Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "Probative" means "[t]ending to prove or disprove." *Black's Law Dictio-*

*nary* 1323 (9th ed.2009). "Probative value" is the measure of the importance of that tendency to the outcome of a case. It is the weight that a piece of relevant evidence will carry in helping the trier of fact decide the issues. "[T]he more essential the evidence, the greater its probative value." *United States v. Stout*, 509 F.3d 796, 804 (6th Cir.2007) (internal quotation marks omitted). Thus, a court analyzing probative value considers the importance of the evidence and the significance of the issues to which the evidence relates. As our supreme court stated in *State v. Torres*, 390 S.C. 618, 703 S.E.2d 226 (2010), "[p]hotographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are . . . not *necessary* to substantiate *material* facts or conditions." 390 S.C. at 623, 703 S.E.2d at 228 (emphasis added). The evaluation of probative value cannot be made in the abstract, but should be made in the practical context of the issues at stake in the trial of each case. *See State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct.App.2008) ("When [balancing the danger of unfair prejudice] against the probative value, the determination must be based on the entire record and will turn on the facts of each case." (citing *State v. Gillian*, 373 S.C. 601, 609, 646 S.E.2d 872, 876 (2007))).

So that we may analyze the probative value of these three photos in the practical context of the issues at stake in this trial, we summarize Dr. Marcus's testimony and the evidence upon which he relied to explain his opinions to the jury.

Before the State introduced the autopsy photos, Dr. Marcus relied on two diagrams he made during the autopsy. These diagrams, which Dr. Marcus characterized as "crude," consist of hand-drawn depictions of a human form with markings to identify the location of Mack's external and internal injuries. Dr. Marcus testified the diagrams would "assist [him] in explaining [his findings] to the jury."

The State then offered the autopsy photos, which Dr. Marcus described as "crucial" and "necessary" for helping the jury understand his testimony. Dr. Marcus testified Exhibits 51 through 57 illustrated Mack's external injuries and were "helpful in determining the cause of death in this case." He described the injuries depicted in each photo and stated they were "consistent with blunt force trauma to the head." As for

Exhibits 80, 81, and 83, Dr. Marcus explained these photos were taken during the autopsy and "depict the cause of death" in a manner that he could not diagram. He testified the photos "actually illustrate what happened to this man's brain" and "would . . . aid [him] in describing the injuries to the jury."

Dr. Marcus then explained each step of the autopsy and his associated findings. He told the jury he first examined Mack's skull by removing the scalp, at which point he discovered Mack suffered a skull fracture to the back right side of the head. He stated it would take a "[s]ignificant amount of force" to cause this skull fracture, and it was consistent with someone "having their feet swept out from under them and landing on their head." He then explained the next step in the autopsy process—removing the skull cap to observe the brain—and discussed his findings. Dr. Marcus testified that when he removed Mack's skull cap, he found "a significant injury" that was "the ultimate cause of death." He explained there was "a massive amount of subdural hemorrhage" and "cerebral contusions" where the skull fracture was located. He testified cerebral contusions indicate a significant amount of trauma and often occur in high-impact car collisions.

At this point in his testimony, Dr. Marcus began describing Exhibits 80, 81, and 83 and explaining what each photo depicted. Starting with Exhibit 81, he testified this photo showed Mack's skull with the scalp removed, and allowed the jury to see "some of the hemorrhage area" caused by the blunt force trauma. The bloody hemorrhage area shown in Exhibit 81 clearly demonstrates the location of the skull fracture Dr. Marcus was attempting to explain. He stated, "That area should be clean with no hemorrhage or anything." Although he did not specifically identify Exhibits 80 and 83 on the record, it is apparent from the context of his testimony and the content of the photos that he was showing the jury these two exhibits to explain his findings:

A. The next part we do is actually removing the skull cap itself and *that's* showing all the hemorrhage in the brain that should not be there, having the brain hemorrhage like that is incompatible to life.

Q. And in order for the brain itself to suffer this kind of hemorrhage, is that more significant than—

A. Yes, yes. You can live with trauma on the scalp. You cannot live with that hemorrhage on the brain.

That's incompatible with life. *That is just a close-up* showing that [the hemorrhage has] been there—it's probably been there about three days.

(emphasis added). Following this testimony, the photos were handed to the jury. Dr. Marcus continued his testimony, stating "the cause of death was a closed head injury due to blunt head trauma." Although he could not determine if the fatal injury occurred during the first or second fight, Dr. Marcus testified the cerebral contusions were "consistent with someone falling" onto a hard surface.

Dr. Marcus's testimony as summarized above increased the probative value of the photos because his use of the photos to explain Mack's injuries demonstrated "the extent and nature of the injuries in a way that would not be as easily understood based on [expert] testimony alone." *State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009). The medical testimony related to Mack's brain injuries and the severity of these injuries, which we do not consider to be a matter readily understood by most jurors, who are typically "unversed in medical matters." 382 S.C. at 291, 676 S.E.2d at 697. We also rely on Dr. Marcus's own testimony that the photos would help him explain to the jury the medical significance of Mack's injuries. *See* 382 S.C. at 290–91, 676 S.E.2d at 697 (relying on pathologist's testimony that autopsy photos would help him demonstrate certain "anatomic relationships" that could not otherwise be explained to the jury); *Dial*, 405 S.C. at 261, 746 S.E.2d at 502 (finding no abuse of discretion to admit autopsy photos when the expert "testified the photographs would aid in her testimony").

The State argues the photos had probative value because they corroborated Dr. Marcus's findings concerning the extent and location of Mack's head injuries, as well as the cause of death. We agree. *See Dial*, 405 S.C. at 260–61, 746 S.E.2d at 502 (finding autopsy photos "were highly probative" to the issue of cause of death because they corroborated expert testimony that victim's injuries were "inconsistent with an

accidental injury"); *State v. Jarrell,* 350 S.C. 90, 106–07, 564 S.E.2d 362, 371 (Ct.App.2002) (affirming admission of autopsy photos that "corroborated ... the pathologist's testimony regarding the extent of th[e] injuries"). When a photo derives probative value from its tendency to corroborate testimony, the measure of this value varies depending on the facts of each individual case. Photos that corroborate important testimony on issues significant to the case may have very high probative value, while photos that corroborate only testimony related to collateral issues will have less probative value. Therefore, we discuss the two reasons this corroborative effect was important on the facts of this case.

First, Gray and Reese each retained their own pathologist to testify at trial. The State knew before trial that Gray and Reese intended to call pathologists to testify, and it must have known the general nature of the testimony they would give. However, the State did not know the substance of their opinions, nor the effect their testimony would have on the credibility of its own pathologist's testimony. This uncertainty affects our analysis of probative value because it made it more important for the State to present evidence to corroborate Dr. Marcus's testimony.

Moreover, as Gray conceded at oral argument, the State reasonably anticipated Gray's pathologist would testify Mack died as a result of injuries he received in the first fight. In fact, while Dr. Shaker testified he could not conclude whether Mack's death resulted from the first or second fight, he clearly suggested the injuries from the first fight would have been fatal. To explain how Mack was able to walk around after these fatal injuries, and even have a conversation with Gray, Dr. Shaker put forth a theory that Mack may have experienced a "lucid interval" at the time of the second fight. However, because the lucid interval was only temporary, Mack would have succumbed to his injuries regardless of Gray's conduct. From such evidence, Gray could argue his actions did not cause Mack's death. *See State v. Jenkins,* 276 S.C. 209, 211, 277 S.E.2d 147, 148 (1981) (stating "one who inflicts an injury on another is deemed by law to be guilty of [murder] *where the injury contributes ... to the death* of the other" (emphasis added)). Thus, the corroborative effect of the

photos served to rebut testimony the State reasonably antici-
pated Gray's pathologist would offer.

The second reason the corroborative effect of these photos
was important is that it aided the State in proving the fatal
brain injury occurred during the second fight. Perry testified
Gray "swept [Mack's] feet out from under him," which caused
Mack to hit his head on the ground. The autopsy photos and
Dr. Marcus's testimony link this act—Gray causing Mack to
fall—with the fatal brain injury in two ways. First, the photos
show extensive cranial bleeding on the back of Mack's head,
and Dr. Marcus testified this fatal injury was "consistent with
someone falling" onto a hard surface. Second, there was no
testimony regarding the first fight that specifically mentioned
any blow to the back of Mack's head. Thus, to prove Mack
died as a result of Gray's actions during the second fight, it
was important for the State to show the jury the significance
and exact location of the injury that caused Mack's death.

The State also argues the photos were important to prove
malice. *See* S.C.Code Ann. § 16–3–10 (2003) (defining "mur-
der" as "the killing of any person with *malice* aforethought,
either express or implied" (emphasis added)). According to
the testimony of the pathologists, a significant amount of force
was necessary to cause Mack's injuries. The photos show
Mack had a massive amount of cranial bleeding in the back
part of his brain, which demonstrated the severity of the force
needed to inflict this injury. Thus, the photos were important
to the State's ability to establish that Gray and Reese acted
with malice. *See State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d
349, 353 (1996) (finding photos of the victim's stab wounds
were "relevant to the issue of malice, an element of assault
and battery with intent to kill"); *State v. Kelley*, 319 S.C. 173,
178, 460 S.E.2d 368, 371 (1995) (finding photos of the crime
scene "depicted the excess nature of the killing" and were
probative to "the issue of malice");[4] *State v. Martucci*, 380

---

4. *Kelley* and *Nance* were tried before the Rules of Evidence were
effective, and thus Rule 403, SCRE, did not apply. *See* Rule 1103(b),
SCRE ("These rules shall become effective September 3, 1995.").
However, both cases were tried after *State v. Alexander*, 303 S.C. 377,
401 S.E.2d 146 (1991), in which our supreme court "adopt[ed] the
language ... of Federal Rule of Evidence 403 that, 'although relevant,
evidence may be excluded if its probative value is substantially out-

S.C. 232, 250, 669 S.E.2d 598, 608 (Ct.App.2008) (stating the autopsy photos were relevant to prove "the [child] abuse manifested an extreme indifference to human life"—the required mental state for homicide by child abuse).

Gray argues, however, that any probative value of the photos was minimal because cause of death was not disputed. Gray explains that neither his nor Reese's pathologist contested the cause of death to which Dr. Marcus testified. We find the argument unpersuasive. Neither the State nor the trial court knew at the time the photos were offered and admitted into evidence that the defense pathologists would agree with Dr. Marcus as to the cause of death. In fact, Gray concedes the State—and presumably the trial court—reasonably anticipated that the defense pathologists were called for the purpose of disputing Dr. Marcus's testimony, which focused primarily on cause of death. The record supports Gray's concession. When Gray objected to the introduction of the photos, the State argued they were necessary because "cause of death is an issue in this case" and Gray and Reese "have hired two . . . pathologists to dispute the [autopsy] findings." Gray and Reese did not respond, leaving the trial court with the clear impression the State's argument was correct. Therefore, at the time the trial court analyzed probative value, the court was unaware of the primary circumstance Gray relies upon for his argument that the photos lacked probative value—that the defense pathologists agreed with the State as to cause of death.

Gray also asserts the photos were unnecessary for the jury to understand Dr. Marcus's testimony because, prior to their introduction, Dr. Marcus relied on diagrams to explain Mack's injuries and the cause of death to the jury. Given the use of these diagrams, Gray argues the probative value of the photos was minimal. We find Dr. Marcus's use of the photos served a different purpose and corroborated different findings than the diagrams. Dr. Marcus described the diagrams as "crude" drawings, and our examination of them convinces us they demonstrated to the jury only the general location of the injuries. In fact, Dr. Marcus stated, "I can't diagram this," in

---

weighed by the danger of unfair prejudice.' " 303 S.C. at 382, 401 S.E.2d at 149.

referencing why the photos were necessary to his testimony. The photos demonstrated what the diagrams could not: the significance of the head injury and the specific location of the primary injury—the skull fracture. Thus, we find the admission of the photos was necessary in combination with the diagrams "to substantiate material facts" regarding the extent of the injuries that caused Mack's death. *Dial*, 405 S.C. at 260, 746 S.E.2d at 502.

For these reasons, we find the probative value of Exhibits 80, 81, and 83 was high.

### D. Unfair Prejudice

■■■■■ The probative value of the photos must be balanced against "the danger of unfair prejudice." Prejudice that is "unfair" is distinguished from the legitimate impact all evidence has on the outcome of a case. " 'Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.' " *State v. Gilchrist*, 329 S.C. 621, 630, 496 S.E.2d 424, 429 (Ct.App.1998) (quoting *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993)). " 'All evidence is meant to be prejudicial; it is only *unfair* prejudice which must be [scrutinized under Rule 403].' " *Id.* (quoting *United States v. Rodriguez–Estrada*, 877 F.2d 153, 156 (1st Cir.1989)); *see also United States v. Mohr*, 318 F.3d 613, 619–20 (4th Cir. 2003) ("Rule 403 only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value, for instance, an appeal to emotion. . . .").

■■■■■ Photos pose a danger of unfair prejudice when they have "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Holder*, 382 S.C. at 290, 676 S.E.2d at 697 (internal quotation marks omitted). This definition of unfair prejudice was taken originally from the Advisory Committee Notes to the formerly identical federal rule 403.[5] *See State v. Alexan-*

---

5. Rule 403 and other federal rules of evidence were amended on December 1, 2011, "as part of the restyling of the Evidence Rules to make them more easily understood and to make style and terminology

*der,* 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991) (adopting the definition of unfair prejudice recited in the Notes of the Federal Rules Advisory Committee). Regarding this definition, the Supreme Court of the United States stated: "The term 'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States,* 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574, 587–88 (1997). Like probative value, unfair prejudice should be evaluated in the practical context of the issues at stake in the trial of the case. *See State v. Wilson,* 345 S.C. 1, 7, 545 S.E.2d 827, 830 (2001) ("The determination of prejudice must be based on the entire record and the result will generally turn on the facts of each case.").

The color photos contained in Exhibits 80, 81, and 83 are graphic. Exhibit 81 shows Mack's scalp folded from the back of his head over his face, exposing the surface of his entire skull. Exhibits 80 and 83 show Mack's exposed brain and the inside of his skull cap. These photos pose a danger of unfair prejudice because their graphic quality has some "tendency to suggest a decision on an improper basis." *Holder,* 382 S.C. at 290, 676 S.E.2d at 697.

However, the objective manner in which Dr. Marcus presented the photos mitigated this tendency. Dr. Marcus's technical explanation of the autopsy process followed by his scientific description of the photos—both prior to the jury seeing them—resulted in an overall discussion that was detached from the emotions of the case and educational to the jury. Although graphic, these particular autopsy photos do not evoke intense emotional or sympathetic reactions to the favor or detriment of either party. Thus, we find the danger of unfair prejudice from Exhibits 80, 81, and 83 was no more than moderate.

### E. Balancing Probative Value and Unfair Prejudice

In ruling on a Rule 403 objection, the trial court "must balance the [unfair prejudice] of graphic photographs against

---

consistent throughout the rules." Fed.R.Evid. 403 advisory committee's note to the 2011 amendment. The changes to Rule 403 are "stylistic only," with "no intent to change any result in any ruling on evidence admissibility." *Id.*

their probative value." *Dial,* 405 S.C. at 260, 746 S.E.2d at 502 (citation omitted). In a pretrial hearing in which the parties and the court discussed the admissibility of these photos, the trial court clearly indicated it would "review them" and evaluate their probative value "at the proper time." When the State offered the photos into evidence during Dr. Marcus's testimony, the trial court excused the jury from the courtroom and conducted a hearing into their admissibility. The trial court allowed the State to proffer the testimony of Dr. Marcus as to how he would use the photos to explain his testimony, and allowed Gray and Reese to cross-examine him.

■■■ We have noted a trial court has "particularly wide discretion in ruling on Rule 403 objections." *Lee,* 399 S.C. at 527, 732 S.E.2d at 228. Moreover, a trial court "is not required to exclude relevant evidence merely because it is unpleasant or offensive." *Dial,* 405 S.C. at 260, 746 S.E.2d at 502 (citation omitted). Based on our previous findings regarding the high probative value of the photos and the moderate danger of unfair prejudice, we find the trial court acted within its discretion in admitting them into evidence. *See* Rule 403 (providing "relevant[ ] evidence may be excluded if its probative value is *substantially outweighed* by the danger of unfair prejudice" (emphasis added)).

Gray argues, however, the photos should have been excluded based on *State v. Collins,* 398 S.C. 197, 727 S.E.2d 751 (Ct.App.2012), *cert. granted,* (Aug. 8, 2013). We find Gray's reliance on *Collins* to be misplaced. In that case, a ten-year-old boy was killed after being attacked by dogs. 398 S.C. at 201, 727 S.E.2d at 753. At trial, the court allowed the State to introduce autopsy photos of the boy's remains, which were "graphic and shocking" and "depict[ed] a ten-year-old boy's body on an autopsy table after being partially eaten by dogs." 398 S.C. at 202, 208, 727 S.E.2d at 754, 757. This court reversed, finding based on the unique facts of that case, "the probative value of the photos is minimal," 398 S.C. at 207, 727 S.E.2d at 756, "[t]he danger of unfair prejudice of the admitted photos is extreme," 398 S.C. at 209, 727 S.E.2d at 757, and "the trial court abused its discretion in admitting the photos." 398 S.C. at 210, 727 S.E.2d at 758.

As we noted in *Collins*, and reaffirm here, both "probative value [and] unfair prejudice should be evaluated in the practical context of the issues at stake in the trial of the case." 398 S.C. at 202, 208, 727 S.E.2d at 754, 757. Focusing on the facts of this case and putting them in the practical context of the issues at stake in this trial, we hold the trial court acted within its discretion to admit the autopsy photos.

## III. Conclusion

Accordingly, the trial court's decision to admit the photos, and Gray's convictions for murder and lynching in the first degree, are **AFFIRMED.**

SHORT and GEATHERS, JJ., concur.