**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

The State, Respondent,

v.

Ariel S. Robinson, Appellant.

Appellate Case No. 2022-000716

———————

Appeal From Greenville County
Letitia H. Verdin, Circuit Court Judge

———————

Unpublished Opinion No. 2025-UP-171
Submitted April 8, 2025 – Filed May 28, 2025

———————

**AFFIRMED**

———————

Appellate Defender Jessica M. Saxon, of Columbia, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General Ambree Michele Muller, both of Columbia; and Solicitor William Walter Wilkins, III, of Greenville, all for Respondent.

———————

**PER CURIAM:** This is an appeal from the trial court's denial of Appellant Ariel Robinson's motion to suppress graphic photographs of the injuries to a

three-year-old child.  Robinson argues the photographs were highly inflammatory and any probative value was substantially outweighed by the danger of unfair prejudice.  We disagree.

## FACTS

On January 14, 2021, emergency personnel responded to Robinson's home for a possible drowning involving her three-year-old foster daughter (Victim).  Robinson lived in the home with her husband Austin (Husband), their two biological children, Victim, and two additional foster children ages seven and five, Victim's brothers.  When emergency personnel arrived, only Robinson, Husband, and Victim were home.  Robinson was attempting to perform CPR, and Victim was unresponsive and cold to the touch.  Firefighters took over CPR and removed Victim's clothing to treat her.  Firefighters noticed bruising on Victim's lower abdomen and extensive bruising on her legs.  Robinson claimed that she accidentally caused the bruises to Victim's abdomen in her attempts to perform CPR on the child.  Robinson further claimed that Victim's seven-year-old brother (J.E.) inflicted the bruises on Victim's legs.  She told first responders that J.E. had anger issues and would often hit Victim.  Victim was rushed to the hospital and transferred to the ICU, but unfortunately succumbed to her injuries and died that evening.

A Greenville County grand jury indicted Robinson and Husband for homicide by child abuse.[1]  At a pretrial hearing, Robinson moved to exclude eight photographs of Victim's injuries, including one autopsy photo, arguing they did not prove any substantial material fact that could not be shown through alternate evidence, and therefore, created an undue likelihood of a verdict based on emotion.  Robinson submitted diagrams of Victim's injuries prepared by Dr. Michael Ward, who performed Victim's autopsy, as an alternative to the photographs.

The trial court excluded two of the photographs under Rule 403 of the South Carolina Rules of Evidence, and found the remaining photographs were probative of the severity of Victim's injuries, the absence of mistake, the "extreme indifference to human life" element of the offense, and whether the injuries could have been inflicted by another child.

---

[1] Husband pled guilty to aiding and abetting homicide by child abuse in the weeks prior to Robinson's trial.  At the time of trial, he was awaiting sentencing.

At trial, the State presented evidence that first responders arrived at the scene and administered CPR to Victim, who was already in cardiac arrest, unresponsive, and cold to the touch. The State admitted body camera footage of the scene, which captured Robinson's statements to first responders. Firefighters testified they observed severe bruising to Victim's abdomen when they removed her shirt. When asked about the bruising, Robinson told firefighters the bruising was caused by her attempts to administer CPR and that she "must have been doing it wrong." EMS workers noticed extensive bruising all over Victim's legs, which they described as completely purple from the waist down. Robinson stated that the leg bruises were caused by J.E. She claimed J.E. often hit Victim and was in therapy for anger issues.

Officer Karlee Patrikis took Robinson's statement at the scene. Robinson told her that Victim became cold after eating a popsicle, so she sat with her under a heated blanket watching TV. Victim ate some snacks and drank three to five cups of water. Robinson stated that Victim complained of a stomach ache and then began choking on the water. Robinson attempted the Heimlich maneuver, but Victim went limp and lost consciousness. Husband then called 911 and Robinson followed the operator's instructions to perform CPR compressions until EMS arrived.

Husband testified for the State. Although he corroborated Robinson's story on the night of Victim's death, he later made statements to law enforcement implicating Robinson. Husband testified J.E. did not cause the injuries to Victim. He testified Robinson was the only one who disciplined Victim, and she often became angry if Victim took too long to eat or use the bathroom. Robinson would set a timer for Victim and then spank her with a hand, belt, or paddle if she did not finish eating or using the restroom before the timer went off. Husband testified that he and Robinson were home with Victim on the day of the incident, while the older children were at school. Husband spent much of the day outside doing chores, but testified that over a period of approximately one hour he heard multiple instances of Robinson "fussing" at Victim for eating slowly and Victim crying. Husband knew from her crying that Victim was being hit.

Husband testified he did not see the bruising on Victim until the afternoon. He explained he saw Robinson holding a belt and standing over Victim. Husband testified he saw the bruising on Victim and told Robinson she had "gone too far this time." Husband left the home to purchase Tylenol for Victim, and only called 911 when Victim finally lost consciousness. Husband testified Victim had been naked, but Robinson put clothes on her to cover the bruising before first responders arrived. Husband asserted he never hurt Victim and did not inflict her injuries, and

that he eventually gave a revised statement to police to "say [his] piece about stuff and try to get some kind of leniency."

Dr. Jaqueline Granger, Victim's treating physician in the ER, testified Victim was in cardiac arrest when she arrived in the ER. She immediately noticed Victim had "extensive bruising" over her body. She testified linear and loop bruising patterns on Victim's legs and abdomen indicated she was hit with an object, and the bruises indicated deep tissue bleeding. She stated it would have been "difficult, if not impossible" for a seven-year-old to cause the bruising, and she did not believe "a seven-year-old of [J.E.'s] size especially, would have been able to hold down a three-year-old long enough to cause that extent of injury." Dr. Granger further testified she had never seen this type of bruising occur after CPR or the Heimlich maneuver, and she believed the injuries resulted from several blows sustained around the same time. She added that after sustaining the blows, "[Victim] would have been in excruciating pain, and then slowly would have become altered and then unconscious."

Dr. Ward, who performed Victim's autopsy, also testified for the State. He opined that Victim's "virtually innumerable" bruises were caused by multiple blunt-force injuries. Dr. Ward also stated the bruising he observed was not consistent with improper CPR, or administration of the Heimlich maneuver. Dr. Ward opined that the pattern bruising indicated Victim was struck with a foreign object, which he agreed could have been a belt. Focusing on Victim's leg injuries, he explained they were not traditional bruises; rather, these were "severe deep injur[ies]" that tore through skin, fatty tissue, a tissue plane, and underlying muscle, and bled throughout the tissue and into the muscle.

Over objection, the State published State's Exhibit 42,[2] an autopsy photograph that Dr. Ward used during his testimony to identify features of his autopsy findings, including the presence of "avulsion pockets." He explained:

> The classic description of an avulsion pocket is someone
> who's been hit by a car. So the back of their legs, it,
> basically, emulsifies or liquifies the fat and tears that
> tissue plane. So this, certainly isn't the force of a car, but

[2] State's Exhibit 42 depicts the back side of Victim's body from the buttocks to her calves. Her thighs are incised from just below the buttocks to the top of her knees, with the outer layers of skin pulled back to reveal the entire inner thigh composition permeated with blood.

> I'm just saying it is a very strong force . . . multiple strong blows that would disrupt that tissue plane allowing blood to enter into those places.

Dr. Ward found Victim's cause of death was multiple blunt-force trauma injuries, explaining she bled to death into her abdomen and legs. He further opined a seven-year-old such as J.E. would lack the strength and coordination to deliver blows of that force.

Robinson testified in her own defense. She denied hitting Victim or causing Victim's bruises. Robinson testified consistently with the statements she previously made to law enforcement. However, she also testified that when firefighters began CPR on Victim, she realized she had not been administering it properly. She explained she left the room as first responders were removing Victim's shirt, and only saw Victim's abdominal bruises later in photographs provided during discovery. She testified she did not realize the severity of the bruises when she told first responders that she had inflicted the abdominal bruises during CPR. Robinson similarly claimed she did not see Victim's leg bruises at the scene. She testified she told EMS that J.E. must have caused the bruises because she knew he had anger issues and had bruised Victim in the past. Once she saw the photographs of Victim's bruises in the State's discovery, she testified she realized J.E. was not capable of causing the bruises. Robinson conceded in her testimony that it would not have been possible for J.E. to have inflicted Victim's severe injuries, and further conceded the abdominal bruises could have not been caused by her attempts at CPR. On cross examination, Robinson admitted for the first time that the injuries had to have been caused by either her or Husband.

The jury convicted Robinson as indicted, and the trial court sentenced her to life imprisonment. This appeal followed.

## STANDARD OF REVIEW

"In criminal cases, the appellate court sits to review errors of law only." *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of discretion." *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009). To warrant reversal based on the admission of evidence, the complaining party "must prove both the error of the ruling and the resulting prejudice." *Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005).

## LAW/ANALYSIS

Robinson argues the trial court erred in admitting the photographs of Victim's injuries. We disagree.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, SCRE. "A trial court has particularly wide discretion in ruling on Rule 403 objections." *State v. Lee*, 399 S.C. 521, 527, 732 S.E.2d 225, 228 (Ct. App. 2012).

"The relevancy, materiality, and admissibility of photographs as evidence are matters left to the sound discretion of the trial court." *State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009) (quoting *State v. Nance*, 320 S.C. 501, 508, 466 S.E.2d 349, 353 (1996)). "If the offered photograph serves to corroborate testimony, it is not an abuse of discretion to admit it." *Id.* (quoting *Nance,* 320 S.C. at 508, 466 S.E.2d at 353). However, "[p]hotographs calculated to arouse the sympathy or prejudice of the jury should be excluded if they are irrelevant or not necessary to substantiate material facts or conditions." *State v. Brazell*, 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997). To be classified as unfairly prejudicial, photographs must have a "tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *State v. Franklin*, 318 S.C. 47, 55, 456 S.E.2d 357, 361 (1995) (quoting *State v. Alexander*, 303 S.C. 377, 382, 401 S.E.2d 146, 149 (1991)). "When juxtaposing the prejudicial effect against the probative value, the determination must be based on the entire record and will turn on the facts of each case." *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008).

In recent years, our supreme court has cautioned prosecutors against the unnecessary admission of gruesome photographs in the guilt phase of a trial where the facts they are intending to prove have been fully established by competent testimony. *See State v. Heyward*, 441 S.C. 484, 501-02, 895 S.E.2d 658, 667 (2023). An appellate court's decision to affirm or reverse the admission of graphic photographs often turns on whether the photographs are probative of a legitimate and disputed issue in the case. In *State v. Nelson*, 440 S.C. 413, 426, 891 S.E.2d 508, 514 (2023), our supreme court concluded the "excessively gruesome" autopsy photos in that case should have been excluded. There was no question in *Nelson* as

to the cause of death—the victim was stabbed some 113 times. *Id.* at 425, 891 S.E.2d at 514. In defense counsel's opening statement to the jury, he admitted the truth of almost every potential disputed fact. *Id.* at 417, 891 S.E.2d at 510. The only issue left for the jury was *who* killed the victim, and the autopsy photographs provided no insight into the identity of the killer. *Id.*

Our appellate courts have repeatedly upheld the introduction of graphic photographs and autopsy photographs when their probative value was established and the trial judge clearly balanced the inherent danger of unfair prejudice against their high probative value. In *State v. Holder*, 382 S.C. 278, 290, 676 S.E.2d 690, 697 (2009), our supreme court upheld the admission of autopsy photographs of a child's injuries where the mother was charged with homicide by child abuse. In *Holder*, the child's mother initially claimed the child had been injured in an ATV accident, then gave police a second statement admitting her boyfriend had repeatedly abused her son. *Id*. at 282, 676 S.E.2d at 693. She testified at trial that she was unaware of any marks on her son prior to his death and thought he was suffering from simple food poisoning. *Id*. at 291, 676 S.E.2d at 697. At trial, the pathologist testified that the child's injuries were not caused by an accident, but by blunt-force trauma to the abdomen. *Id.* at 282, 676 S.E.2d at 692-93. The child had numerous bruises all over his body in various stages of healing. *Id*. at 282-83, 676 S.E.2d at 692-93. The pathologist further testified that he was not sure the jury could understand the injuries without the photographs. *Id.* at 290, 676 S.E.2d at 697.

The supreme court affirmed the admission of the photographs, finding they "clearly demonstrate the extent and nature of the injuries in a way that would not be as easily understood based on the testimony alone." *Id.; see also State v. Benton,* 443 S.C. 1, 5, 8-9, 901 S.E.2d 701, 703, 705 (2024) (upholding the admission of graphic crime scene photos where they "drew probative force from their unique power to make Benton's accomplices' testimony more believable," providing "important context to the testimony and other evidence about who did what at the scene"); *Heyward*, 441 S.C. at 503, 895 S.E.2d at 668 (upholding the admission of autopsy photographs corroborating manner of death where the defendant disputed the expert opinion from the State); *State v. Gray*, 408 S.C. 601, 613-14, 759 S.E.2d 160, 167 (Ct. App. 2014) (upholding the admission of autopsy photos to corroborate State's expert witness and to refute the testimony of defense's expert).

In this case, we hold that the photographs were necessary to refute Robinson's claims that Victim's injuries were caused by Robinson's CPR attempts and by J.E.'s abuse. Robinson consistently told this story at the scene to first responders. Only

after the State rested its case and Robinson took the stand did she admit for the first time that Victim's injuries could not have been caused by a seven-year-old child. Of course, the State could not have known whether Robinson would testify at trial or what the substance of her testimony would be. The State further had no way to anticipate that Robinson would concede on cross-examination that Victim's injuries had to have been caused by either her or Husband. The State had the burden of proving every element of the offense beyond a reasonable doubt and also had to anticipate any possible defenses Robinson might raise. Given Robinson's consistent statements blaming a seven-year-old child for the injuries, the photographs of the extent and severity of the injuries were crucial to the State's case.

We also find the photographs were probative of the cause of death as well as the elements of the offense of homicide by child abuse. "A person is guilty of homicide by child abuse if the person … causes the death of a child under the age of eleven while committing child abuse or neglect, and the death occurs under circumstances manifesting an extreme indifference to human life …" S.C. Code Ann. § 16-3-85(A)(1) (2015). "Extreme indifference" under this statute has been defined as a "mental state akin to intent characterized by a deliberate act culminating in death." *Holder*, 382 S.C. at 289, 676 S.E.2d at 696 (quoting *McKnight v. State*, 378 S.C. 33, 48, 661 S.E.2d 354, 361 (2008)). The cause of death in this case was somewhat unique in that the vast majority of Victim's bruises were on the legs and the back of the legs. Dr. Ward testified that Victim died from blood loss into the tissues of her abdomen and legs caused by the force of the blows. The autopsy photograph of the deep-tissue bleeding helped illustrate to the jury how Victim could have bled to death from a spanking that did not break the skin. We believe that the autopsy photos showing the bleeding deep in the tissues of Victim's legs were probative as to the cause of death and probative as to whether Robinson spanked the child in a manner "manifesting an extreme indifference to human life."

For the above reasons, we affirm.

**THOMAS, HEWITT, and CURTIS, JJ., concur.**