# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Meswaet Abel, as Personal Representative of the Estate of Zerihun Wolde and as Natural Parent and Legal Guardian of Adam Wolde and Wubit Wolde, Respondent,

v.

Lack's Beach Service, City of Myrtle Beach, and John Doe Lifeguard, Defendants,

Of which Lack's Beach Service is the Appellant.

Appellate Case No. 2023-000569

———————

Appeal From Horry County
Kristi F. Curtis, Circuit Court Judge

———————

Opinion No. 6118
Heard February 12, 2025 – Filed July 16, 2025

———————

**AFFIRMED**

———————

C. Mitchell Brown and Blake Terence Williams, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia; Joseph DuRant Thompson, III, of Hall Booth Smith, PC, of Mount Pleasant; and Elizabeth Fulton Morrison, of Whelan Mellen & Norris, LLC, of Charleston, all for Appellant.

William Mullins McLeod, Jr., and Harry Cooper Wilson, III, both of McLeod Law Group, LLC, of Charleston; George Murrell Smith, Jr., of Smith Robinson Holler

DuBose Morgan, LLC, of Sumter; Austin Tyler Reed and Frederick Newman Hanna, Jr., both of Smith Robinson Holler DuBose Morgan, LLC, of Columbia; and John Christopher Pracht, V, of Pracht Injury Lawyers, LLP, of Anderson, all for Respondent.

---

**TURNER, J.:**  In this wrongful death action involving a fatal drowning, Lack's Beach Service (Lack's) appeals a jury award of approximately $20 million in damages to Meswaet Abel and her four children.  Specifically, Lack's appeals the trial court's denial of its post-trial motions for judgment notwithstanding the verdict (JNOV) and a new trial absolute and the award of punitive damages.  We affirm.

## FACTS/PROCEDURAL HISTORY

Lack's contracted with the City of Myrtle Beach (the City) as its "Water Safety Program" provider and "Concessionaire" for beach rentals.  In 2018, Lack's and the City entered into a seven-year "Water Safety Franchisee" Agreement (Franchise Agreement) for the 2018-2025 seasons.  The Franchise Agreement stated that Lack's would "operate a water safety service and beach concession" on the City's public beaches from April 15 to September 30, Monday through Sunday, from 8:00 a.m. to 5:00 p.m.  In addition to staffing permanent lifeguard stands in eighty-nine zones across the beach, Lack's also agreed to provide "mobile lifeguards," referred to as "Lifeguard Onlys" (LGOs), at various ratios throughout the zones.[1]  From the first week of June through Labor Day, Lack's was required to provide at least one LGO for every six permanent stands on the beach and one off-stand supervisor for every ten stands.  The Franchise Agreement also required that each lifeguard "[s]uccessfully complete a course consisting of . . . not less than 40 hours in open water life saving which [met] the criteria of the United States Life[saving] Association" (USLA).  Additionally, the Franchise Agreement authorized Lack's to rent chairs, umbrellas, floats, and boogie boards; it also required Lack's to "be responsible for the cleanliness of its franchise zone(s)."

On August 23, 2018, Abel arrived at the Sea Crest Resort in the City with her father; her fiancé, Zerihun Wolde; and their four children.  Around noon the next day, the family walked down to the beach using the private access from the hotel and set up their chairs and umbrellas near lifeguard stand L-22.  Abel stayed on the beach with the youngest children while Wolde went into the water with the two

---

[1] The lifeguard stands were placed approximately every block along the beach.

oldest—Adam and Wubit. Abel testified she did not see any red flags or signs on the beach warning of dangerous conditions, and she observed lots of people on the beach and in the water. Abel testified that approximately thirty to forty-five minutes later, Adam came running up to her shouting that Wolde needed help. She left the other children with her father and ran down the beach to the right, past the lifeguard stand, where she saw Wolde. Abel testified that several bystanders administered assistance to Wolde, including giving him CPR, and an ambulance transported him to the hospital. When she arrived at the hospital, she was informed that Wolde had died from drowning.

Adam testified that when he went into the water with Wubit and Wolde, they were initially in waist deep water, but he soon noticed that he was "unintentionally getting deeper and deeper" until the water was up to his neck and he started treading water. He stated he was in front of his father, who was "hugging" Wubit, just out of arm's reach. Adam testified that they tried to swim back into shore but continued to be pulled further away, so all three of them began waving their arms and yelling for help as loudly as they could. Adam was able to swim safely to shore, but he became separated from Wolde and Wubit who were "still in trouble." He saw a bystander, who had seemingly heard their yells for help, making his way out into the water towards Wolde and Wubit. Adam testified that from the time he first felt the water pulling him out until the time he got out of the water, he never saw a lifeguard and no lifeguard entered the water to assist his family.

Wubit testified similarly. She stated Wolde was trying to hold onto her and tread water and he yelled for help approximately twenty times. She recalled that Wolde "was struggling to keep his head above water" and would go under and come back up, "gasp," and yell for help. Wubit testified this struggle lasted around ten to fifteen minutes. She stated she could see people on the beach who appeared to be "trying to see what was going on," and eventually, three or four people came into the water, and a woman helped her to shore. Wubit asserted that, by that time, Wolde had stopped yelling and his entire body was submerged as she held onto his shirt. She testified that she did not see a lifeguard until her father was on the beach receiving medical attention.

Two bystanders, Jeffrey Bender and Julian Chandler, also testified. Bender recalled that his family was in the water near the L-21 lifeguard stand when they heard screams for help. He did not see a lifeguard, so he told his wife and children to go find one, and he went into the water toward the screams. Bender stated he reached a woman who was yelling for help; she was with a young girl, and the girl was clinging to a man who was bobbing facedown in the water. Bender flipped the

man over and saw he was foaming at the mouth. Bender stated the woman carried the girl to shore while he dragged the man by the torso; he recalled fighting against a "very strong current." Bender stated he did not see a lifeguard until after Wolde was already on shore.

Chandler testified his family arrived at the beach shortly before noon and set up near the L-22 lifeguard stand. He recalled seeing a lifeguard sitting on the back of the stand talking to two people with his back to the water.[2] Chandler did not see any warning flags on the beach. Approximately five to ten minutes later, Chandler heard calls for help and saw two men and a woman assisting another man and a young girl out of the water. He went out in the water to assist with bringing Wolde to shore. Chandler stated that when they got Wolde to the beach, "[h]e was in a very desperate situation" with "a lot of water and sand coming out of his mouth." He recalled another bystander began CPR, during which time the lifeguard he had seen by the lifeguard stand earlier appeared in the crowd; he asserted the lifeguard did "nothing" to assist Wolde. Chandler asserted the lifeguard should have been able to hear the bystanders' yells for assistance.

Chris Brewster, chairman of USLA's National Certification Committee, testified USLA sets the national standard of care for ocean lifeguards. He asserted USLA's position was that lifeguards should not be assigned any task other than watching the water while he or she is on the stand, and he stated requiring lifeguards to "sell chairs" while on the stand was inconsistent with USLA standards. Brewster explained that when Lack's first submitted its application for certification in 1995, USLA "had never received an application . . . from a private lifeguard operation that was vending as well as providing lifeguards," and "a decision was made that [USLA] would allow lifeguard agencies that allowed their lifeguards to vend . . . to be certified so long as the lifeguards who were assigned on the stand watching the water . . . could never be involved in commerce" while on the stand. Brewster asserted that after USLA sent a letter to Lack's in January 1996 inquiring whether any lifeguards would be involved in commercial activities, he had a phone call with Lack's owner, who indicated that "none of the lifeguards assigned to the tower would be responsible for watching the water and vending goods at the same time."[3] He testified that afterwards, he was convinced that Lack's met the USLA standard and Lack's was certified. He further testified that when Lack's requested

---

[2] Lack's asserted the lifeguard was "explaining the meaning of different [colors] of the flags" to someone who inquired, not engaging in rental sales.

[3] Lack's objected to the admission of letters from USLA dated January 21, 1996; January, 27, 1996; September 11, 2007; October 24, 2007; and March 26, 2008.

recertification periodically thereafter, Lack signed a portion of the application verifying that it would not have lifeguards watching the water and vending goods at the same time. However, when Brewster visited Myrtle Beach in 2007, he walked down the beach and observed "lifeguards who were assigned to water surveillance [who] were renting and vending." He stated he felt Lack's had lied to USLA. Brewster testified he notified the National Certification Committee of his observations and the committee undertook an investigation, which ultimately resulted in the revocation of Lack's certification due to its violation of USLA's standards.

Brewster also testified about USLA's training requirements, specifically that lifeguards "successfully complete a course consisting of not less than 40 hours" of open-water training. He explained that such training includes "recognizing what a victim in distress looks like, learning about rip currents so [lifeguards] understand what rip currents are and what somebody in distress in a rip current might look like," as well as "mock rescues" to learn to rescue victims. He asserted that "training in a manner that allows the person on the stand to be involved in vending would be inconsistent with the USLA's training standards."

Dr. Thomas Griffiths testified as an expert in aquatic safety. He stated Lack's breached the standard of care in this case by (1) requiring lifeguards to sell merchandise and clean the beach in addition to their lifeguarding duties, (2) providing sub-standard training that did not comply with the Franchise Agreement or USLA standards, (3) failing to warn beachgoers of known hazardous conditions or to close the affected sections of the beach, (4) failing to recognize Wolde as a distressed swimmer, and (5) understaffing the beach on the day of the incident. Specifically, Dr. Griffiths pointed out that Lack's training fell short of the forty hours required by the Franchise Agreement and was conducted improperly. He noted that records for the lifeguards on stands L-20, L-21, and L-22 were either incomplete or stated training had taken place on dates the lifeguards were not in Myrtle Beach. He stated that based on the personnel records he reviewed, it did not appear that the lifeguards had enough time to complete the forty hours of training between the time they arrived in Myrtle Beach and when they began their lifeguarding duties. Dr. Griffiths also opined that all lifeguards should be "lifeguard onlys" and based on the dual role required by Lack's, their training could not comply with USLA standards. Additionally, he noted that on the day of the drowning, Lack's received a rip current warning at approximately 10:00 a.m., but there was no evidence Lack's put up additional warnings or closed affected portions of the beach. Dr. Griffiths asserted that Wolde "was a distressed victim that could have and should have been easily recognizable by attentive lifeguards"

and opined that Lack's operated in a dangerous and unsafe manner, which was "a direct cause of his death."

Lack's acknowledged Abel and her family set up closest to the L-22 stand; Wolde and the older children drifted down the beach to the south; and Wolde and the children were closest to the L-21 stand when Wolde became distressed and the bystanders pulled him out of the water. It was undisputed that the lifeguard assigned to L-21 was on his lunch break at the time of the incident, leaving that stand unmanned. Lack's asserted that a red flag was up in front of the L-22 stand; however, because the lifeguard at L-21 was at lunch, there was no flag in front of his stand. Lack's explained that the lifeguards would close their stand and remove their flags when they went to lunch, but they did not close the beach to beachgoers; rather, the lifeguards on either side were expected to watch that stretch of water or an LGO would cover it. Lack's admitted that the three lifeguards stationed at L-20, L-21, and L-22 missed several training sessions because they were not yet in the country when training began. Lack's also acknowledged that it did not have any sign-up sheets or "proof of the training" for the lifeguards involved in this incident.

Lack's asserted that it had been a "dual-role agency" for many years, which meant its lifeguards were required to engage in selling "beach concessions" as well as performing their lifeguarding duties. Lifeguards also received commissions based on their rental sales. Lack's agreed that "there is a national standard of care when it comes to lifeguards" and acknowledged the January 1996 letter from USLA stating that, in order to maintain Lack's USLA certification, it had agreed that "lifeguards assigned to water surveillance [would] not be assigned to any other duties." However, Lack's denied representing to USLA that its lifeguards would not be responsible for any other tasks; rather, it averred the agreement was "to provide [LGO] personnel" in a ratio determined by Lack's and USLA. Lack's asserted that because the Franchise Agreement specifically called for and defined LGOs, it implicitly acknowledged that its other lifeguards operated in a dual role. Lack's personnel testified that on August 24, there were only three LGOs—the only personnel whose "sole responsibility was water observation"—on a more than two-mile stretch of beach. Lack's agreed that pursuant to the Franchise Agreement staffing requirements, it was at least one LGO short that day and that the additional LGO could have made a difference if he or she had been present.

Over Lack's objection, the trial court admitted evidence regarding the sales revenue generated by the beach concessions for the month of August 2018—including the daily totals for the lifeguards at L-20, L-21, and L-22 on August 24—as well as Lack's total rental revenue for 2018. Abel also questioned Lack's regarding a 2002

workers' compensation case in which it asserted that its lifeguards engaged in beach concession duties 99.995% of the time and lifeguarding duties 0.00047% of time.

The jury found Lack's was negligent and its negligence caused Wolde's death; the jury found no negligence on the part of Wolde. The jury awarded actual damages for Wolde's conscious pain and suffering in the amount of $3.73 million and wrongful death damages of $10 million. The jury also found Lack's acted in "a reckless, willful, or wanton manner." The parties then proceeded to try the issue of punitive damages. Lack's testified it had $3 million in total insurance and, as of December 31, 2021, it had a net worth of negative $473,350.51. The jury ultimately awarded $7 million in punitive damages.

Lack's timely filed post-trial motions for JNOV, a new trial absolute, and a new trial nisi remittitur. Before a hearing could be held on the motions, the trial court issued an order upholding the constitutionality of the punitive damages award. Lack's subsequently filed a Rule 59(e), SCRCP, motion to reconsider. After a hearing on the pending post-trial motions, the trial court issued an order denying the motions. This appeal followed.

## ISSUES ON APPEAL

I.      Did the trial court err in denying Lack's JNOV motion?

II.      Did the trial court err in denying Lack's motion for a new trial absolute?

III.      Did the trial court err in upholding the jury's punitive damages award?

## DIRECTED VERDICT AND JNOV MOTIONS

"A motion for a JNOV is merely a renewal of the directed verdict motion." *RFT Mgmt. Co. v. Tinsley & Adams L.L.P.*, 399 S.C. 322, 331, 732 S.E.2d 166, 171 (2012). Therefore, "only the grounds raised in the directed verdict motion may properly be reasserted in a JNOV motion." *Id.* at 331, 732 S.E. 2d at 170-71. "When reviewing the trial court's ruling on a motion for a directed verdict or a JNOV, this [c]ourt must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Id.* at 331-32, 732 S.E.2d at 171. "The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt." *Id.* at 332, 732 S.E.2d at 171.

"Moreover, '[a] motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict.'" *Id.* (alteration in original) (quoting *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998)). "In deciding such motions, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence." *Id.* "An appellate court will reverse the trial court's ruling only if no evidence supports the ruling below." *Id.*

## 1. Dual Role

Lack's argues the trial court erred in denying its motions for a directed verdict and JNOV because the dual-role arrangement for its lifeguards was expressly permitted by its contract with the City and pursuant to section 5-7-145 of the South Carolina Code (2004). Further, Lack's asserts "the applicable standard of care in this case was set forth in the Franchise Agreement." It also argues Abel did not produce any direct evidence that would "allow the jury to conclude that the relevant lifeguards were engaged in commercial activity at the time of the drowning." We disagree.

In cases of professional negligence, "the standard of care that the plaintiff must prove is that the professional failed to conform to the generally recognized and accepted practices in his profession." *Doe v. Am. Red Cross Blood Servs., S.C. Region*, 297 S.C. 430, 435, 377 S.E.2d 323, 326 (1989). A court may "define the standard of care by looking to the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines." *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 589, 784 S.E.2d 670, 675 (2016).

Although the Franchise Agreement appears to acknowledge that some of Lack's lifeguards would engage in a dual role because it specifically provides for a subcategory of LGOs, it merely implies that dual roles will exist; it does not "expressly" approve the dual-role set up. Additionally, the Franchise Agreement does not set forth any standards or guidelines for how Lack's dual-role employees should perform their duties. Further, although a court may look to statutes for guidance as to the applicable standard, the particular statute relied upon by Lack's, section 5-7-145, does not set forth a standard of care. Section 5-7-145(B) merely states that coastal municipalities may provide lifeguard services for its beaches "using municipal employees or by service agreement with a private beach safety company." The section further provides that if the municipality elects to contract with a private company, "the municipality may grant the exclusive right to the beach safety company to rent only the beach equipment and to sell only the items to the public on the beach that are allowed by the municipality." *See*

§ 5-7-145(B)(3). However, the statute does not specifically authorize lifeguards to rent equipment.

Abel presented expert testimony regarding the standard of care for professional lifeguards and asserted that Lack's breached that standard by requiring its lifeguards to sell merchandise and clean the beach in addition to their lifeguarding duties. Abel further presented bystander testimony that the L-22 lifeguard was sitting on the back of the stand, facing away from the ocean, talking to two people near the "umbrella line" five to ten minutes before bystanders rendered aid to Wolde.[4] Abel also introduced sales revenue data showing that the lifeguards at L-20, L-21, and L-22 made approximately $1,100 in combined sales on the day of the incident. Moreover, Abel introduced evidence of correspondence between Lack's and USLA regarding Lack's certification. Significantly, based on the correspondence alone, we find the jury could conclude that Lack's knew the dual-role requirement was an unsafe practice and in violation of the accepted standard of care in the industry.

Therefore, we hold the trial court properly submitted to the jury the issue of whether the lifeguards' dual role breached the standard of care and was a factor in Wolde's death, and we affirm the denial of the JNOV and directed verdict motions as to this ground. *See RFT Mgmt. Co.*, 399 S.C. at 332, 732 S.E.2d at 171 ("The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt.").

### 2. Standard of Care and Proximate Cause

Lack's argues the trial court erred in denying its motions for a directed verdict and JNOV because the evidence failed to establish that Lack's breached the standard of care or proximately caused Wolde's drowning. We disagree.

Initially, we find Lack's arguments regarding the standard of care—other than the dual-role issue addressed above—are not preserved for appellate review because they were not raised to the trial court during Lack's directed verdict motion.

---

[4] Chandler testified that just before he heard a commotion in the water, he walked down to the water and then, on his way back to his family's spot, he noticed "the lifeguard was in the same position that we saw when we first came out. He was sitting on the back end of the lifeguard stand chatting with a few individuals with his back to the water." When asked if the people the lifeguard was speaking to were "within . . . the umbrella line," Chandler replied that "they were near them."

Similarly, Lack's arguments regarding proximate cause—specifically its arguments as to training and understaffing—are not preserved. *See RFT Mgmt. Co.*, 399 S.C. at 331, 732 S.E.2d at 171 ("A motion for a JNOV is merely a renewal of the directed verdict motion."); *id.* at 331, 732 S.E. 2d at 170-71 ("[O]nly the grounds raised in the directed verdict motion may properly be reasserted in a JNOV motion.").

During the directed verdict stage of trial, Lack's argued *only* that Abel had failed to prove proximate cause because there was no evidence of the "amount of time the family struggled" or that "a lifeguard could get from his or her location to [] Wolde to change th[e] outcome." As to these two grounds, we find Abel presented sufficient evidence such that a reasonable jury could have concluded Lack's negligence proximately caused Wolde's death. *See Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 371 S.C. 123, 147, 638 S.E.2d 650, 662 (2006) ("The question of proximate cause ordinarily is one of fact for the jury, and it may be resolved either by direct or circumstantial evidence."); *Gastineau*, 331 S.C. at 568, 503 S.E.2d at 713 ("A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict.").

First, Wubit testified Wolde was in distress for "a long period of time," around ten to fifteen minutes. Additionally, it was undisputed that L-21, the lifeguard stand closest to where Wolde became distressed and was ultimately pulled from the water, was not staffed at the time of the incident; however, the beach in front of the stand was not closed. Dr. Griffiths opined that Lack's breached the standard of care by failing to appropriately train its lifeguards in compliance with the forty-hour requirement and further engaged in unsafe practices by allowing lifeguards to leave their stand unattended during their lunch break without appropriate backup coverage. Further, Dr. Griffiths asserted that Wolde "was a distressed victim that could have and should have been easily recognizable by attentive lifeguards" and opined that Lack's operated in a dangerous and unsafe manner that was "a direct cause of his death." Indeed, the bystanders who ultimately pulled Wolde from the water did so because they were able to see and hear Wolde in distress in the ocean in front of the stand. Although Lack's disputed whether it did in fact provide sufficient coverage for the vacant stand, we find the evidence was such that it could yield "more than one reasonable inference," and therefore, we affirm the denial of the motions for a directed verdict and JNOV on this ground. *See Roddey*, 415 S.C. at 590, 784 S.E.2d at 676 ("The defendant's negligence does not have to be the sole proximate cause of the plaintiff's injury; instead, the plaintiff must prove the defendant's negligence was at least one of the proximate causes of the injury."); *RFT Mgmt. Co.*, 399 S.C. at 332, 732 S.E.2d at

171 ("The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt."); *id.* ("In deciding such motions, neither the trial court nor the appellate court has the authority to decide credibility issues or to resolve conflicts in the testimony or the evidence.").

### 3. Conscious Pain and Suffering

Lack's argues the trial court erred in submitting Abel's survival claim to the jury because there was no evidence of *conscious* pain and suffering. Specifically, Lack's equates Wolde's "pre-drowning struggles," as testified to by Wubit, with "pre-impact fear," which South Carolina has not recognized as an element of recoverable damages.[5] Lack's argument, somewhat confusingly, seems to imply that a person is not actively drowning unless they are unconscious or no longer resurfacing. For example, it characterizes the record as "reflect[ing] gasping and yelling *prior to* the tragic drowning," and states that "[a] struggling swimmer who recovers and comes ashore and *escapes the drowning* is not entitled to recover." Moreoever, Lack's argues expert testimony regarding the drowning process was required. We disagree.

"Damages in a survival action include recovery for the deceased's conscious pain and suffering . . . ." *Smalls v. S.C. Dep't of Educ.*, 339 S.C. 208, 216, 528 S.E.2d 682, 686 (Ct. App. 2000). Wubit testified that her father struggled in the water for ten to fifteen minutes—repeatedly going under, resurfacing, and "gasping" for breath. Further, bystander testimony indicated that upon his retrieval from the water, Wolde had "a lot of water and sand coming out of his mouth."

Although we could not locate any South Carolina cases directly on point, common sense dictates that the struggle to "escape the drowning" is, in fact, part of the active drowning process. Further, we could not locate any authority supporting Lack's proposition that expert testimony is required in South Carolina in order to submit the issue of pain and suffering to a jury. Thus, we hold the testimony from Adam, Wubit, Bender, and Chandler—all of whom were eyewitnesses to the drowning—was sufficient to submit the survival claim to the jury, particularly in light of the standard of review, which requires us to construe the evidence in the

---

[5] "Pre-impact fear" is the mental trauma a person experiences because of his knowledge of his impending death. *See Rutland v. S.C. Dep't of Transp.*, 390 S.C. 78, 84, 700 S.E.2d 451, 454 (Ct. App. 2010), *aff'd as modified by*, 400 S.C. 209, 734 S.E.2d 142 (2012).

light most favorable to Abel, as the nonmoving party.  *See RFT Mgmt. Co.*, 399 S.C. at 332, 732 S.E.2d at 171 ("The trial court must deny a motion for a directed verdict or JNOV if the evidence yields more than one reasonable inference or its inference is in doubt."); *id.* at 331-32, 732 S.E.2d at 171 ("[T]his [c]ourt must apply the same standard as the trial court by viewing the evidence and all reasonable inferences in the light most favorable to the nonmoving party."); *Smalls*, 339 S.C. at 217-18, 528 S.E.2d at 686-87 (finding "evidence existed from which the jury could have determined the victim experienced conscious pain and suffering" when the victim's father testified that "his daughter was gasping for air and moaning somewhat" immediately after being struck by a vehicle, even though he acknowledged the daughter was unconscious when transported to the hospital and never regained consciousness before succumbing to her injuries).  We therefore affirm the denial of the JNOV motion as to this ground.

### 4. Punitive Damages

Lack's also argues the trial court erred in failing to grant its JNOV motion because Abel failed to prove recklessness by clear and convincing evidence as required for punitive damages.  We hold Abel presented sufficient evidence of recklessness to allow the issue to be submitted to the jury and to support the verdict.

"Negligence is the failure to exercise due care, while gross negligence is the failure to exercise slight care."  *Solanki v. Wal-Mart Store No. 2806*, 410 S.C. 229, 237, 763 S.E.2d 615, 619 (Ct. App. 2014).  "[R]ecklessness implies the doing of a negligent act knowingly . . . . [T]hat is, the conscious failure to exercise due care." *Yaun v. Baldridge*, 243 S.C. 414, 419, 134 S.E.2d 248, 251 (1964) (quoting *State v. Rachels*, 218 S.C. 1, 8, 61 S.E.2d 249, 252 (1950)).  "If a person of ordinary reason and prudence would have been conscious of the probability of resulting injury, the law says the person is reckless or willful and wanton . . . ."  *Berberich v. Jack*, 392 S.C. 278, 287, 709 S.E.2d 607, 612 (2011).

Abel presented evidence that Lack's consciously failed to exercise due care in training its lifeguards and staffing the beach.  Dr. Griffiths opined that Lack's breached the standard of care by failing to appropriately train its lifeguards in compliance with the forty-hour requirement and by understaffing the beach on the day of the incident with vacant stands and too few LGOs.  Moreover, the Franchise Agreement stated Lack's would "operate a water safety service and beach concession" on the City's public beaches, and the lifeguards it employed would "[s]uccessfully complete a course consisting of . . . not less than [forty] hours in open water life saving which [met] the criteria of the [USLA]."  Lack's admitted

the lifeguards involved here missed several training sessions and that it had no proof the forty hours of training was actually completed. Further, it was undisputed that Lack's was short staffed on August 24 because it had fewer than the required number of LGOs on duty, the lifeguard at L-21 was on his lunch break, and Lack's expected the lifeguards in the neighboring stands approximately a block away to cover that section. Additionally, we find the jury could infer from the letters between Lack's and USLA that Lack's knew dual-role lifeguarding was dangerous and a violation of the national standard of care. Accordingly, we affirm the denial of the JNOV motion as to this ground.

Based on the foregoing, we affirm the trial court's denial of Lack's directed verdict and JNOV motions. *See RFT Mgmt. Co.*, 399 S.C. at 332, 732 S.E.2d at 171 ("A motion for JNOV may be granted only if no reasonable jury could have reached the challenged verdict." (quoting *Gastineau v. Murphy*, 331 S.C. 565, 568, 503 S.E.2d 712, 713 (1998))); *id.* ("An appellate court will reverse the trial court's ruling only if no evidence supports the ruling below.").

**NEW TRIAL ABSOLUTE**

"The grant or denial of new trial motions rests within the discretion of the [trial] court, and its decision will not be disturbed on appeal unless its findings are wholly unsupported by the evidence, or the conclusions reached are controlled by error of law." *Swicegood v. Lott*, 379 S.C. 346, 355-56, 665 S.E.2d 211, 216 (Ct. App. 2008). "This [c]ourt has the duty to review the record and determine whether there has been an abuse of discretion amounting to an error of law." *Vinson*, 324 S.C. at 406, 477 S.E.2d at 723-24. "In deciding whether to assess error to a court's denial of a motion for a new trial, we must consider the testimony and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Id.* at 405, 477 S.E.2d at 723.

### 1. Admission of Evidence

Lack's argues this court should grant a new trial based on the erroneous admission of unfairly prejudicial evidence—the 2018 sales data, the workers' compensation testimony, and the evidence regarding USLA certification. Lack's asserts that it was entitled to a new trial due to "error in the admission of irrelevant, non-probative and grossly prejudicial evidence that can only be remedied by the granting of a [n]ew [t]rial [a]bsolute."

"Only relevant evidence is admissible." *State v. Hamilton*, 344 S.C. 344, 354, 543 S.E.2d 586, 591 (Ct. App. 2001), *overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005). "Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears." *Id.* "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Rule 403, SCRE. "To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice . . . ." *Vaught v. A.O. Hardee & Sons, Inc.*, 366 S.C. 475, 480, 623 S.E.2d 373, 375 (2005). "Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence . . . ." *Fields v. J. Haynes Waters Builders, Inc.*, 376 S.C. 545, 557, 658 S.E.2d 80, 86 (2008).

"The admission of evidence is within the sound discretion of the trial [court], and absent a clear abuse of discretion amounting to an error of law, the trial court's ruling will not be disturbed on appeal." *Vaught*, 366 S.C. at 480, 623 S.E.2d at 375. "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion without evidentiary support." *Id.* However, "[a] trial [court]'s balancing decision under Rule 403 should not be reversed simply because an appellate court believes it would have decided the matter otherwise because of a differing view of the highly subjective factors of the probative value or the prejudice presented by the evidence." *Hamilton*, 344 S.C. at 358, 543 S.E.2d at 593-94.

### i. 2018 Sales Receipts

Lack's argues the trial court's admission of its gross sales data for all of 2018 was reversible error entitling it to a new trial. Lack's argues the sales data evidence was not limited in scope and was not relevant to whether the lifeguards involved were "engaged in a commercial transaction at the time" of the incident. It argues that only evidence of net worth is appropriate even in the damages phase of trial. Lack's contends it was prejudiced because of the "false impression" the evidence created about Lack's finances.

Although we agree that the admission of the evidence was arguably error due its broad scope, we find Lack's was not prejudiced by its admission because there was compelling evidence of Lack's negligence and recklessness, regardless of the sales receipts. As to Lack's contention that the evidence created a "false impression" about its finances, we are not convinced the damages award was influenced by this

evidence such that the jury would not have otherwise awarded this amount. We note that although the sales data was likely irrelevant except for perhaps the week of the incident, the totals for the day of the drowning show that the lifeguards engaged in sales while on duty, which lends credibility to the bystander testimony from Chandler. More importantly in this court's estimation, Abel presented compelling evidence that Lack's knew its practices were negligent but continued them for many years; we find this evidence, more than the sales data, influenced the jury's award.

For example, Dr. Griffiths testified to numerous breaches of the standard of care, including: (1) requiring lifeguards to sell merchandise and clean the beach in addition to their lifeguarding duties, (2) providing sub-standard training that did not comply with the Franchise Agreement or USLA standards, (3) failing to warn beachgoers of known hazardous conditions or to close the affected sections of the beach, (4) failing to recognize Wolde as a distressed swimmer, and (5) understaffing the beach on the day of the drowning. Further, Lack's acknowledged that the lifeguards involved in this incident missed several hours of training and that Lack's did not have any records showing the lifeguards had completed *any* aspect of their training, as required by the Franchise Agreement. Additionally, it was undisputed that the lifeguard assigned to the L-21 stand, closest to where Wolde became distressed, was on his lunch break. The stand was unmanned, there were no flags displayed at the stand, and the beach in front of it was not closed. The L-22 lifeguard, one of the lifeguards who was supposed to be covering that section of beach from approximately one city block away, was seen talking to people near the "umbrella line" with his back to the water for several minutes shortly before the incident. Wubit testified her father struggled in the water for ten to fifteen minutes and during that time no lifeguard came to assist the family; yet, bystanders on the shore were able to hear the family's cries for help, locate them in the water, and render aid. Thus, we find there was significant evidence of Lack's negligent and reckless conduct that contributed to the drowning.

Abel also presented evidence that Wolde was only forty-one years old at the time of his death, and his survivors included a fiancée and four young children. Wolde stayed at home with the children and was their primary caregiver, while Abel worked full-time. Moreover, Wubit offered heartbreaking testimony about what she witnessed and experienced, including holding onto Wolde and floating on him like a life preserver as he repeatedly went under the water and resurfaced gasping for breath.

Further, we note that Lack's presented evidence of its net worth—or lack thereof—during the damages phase. Therefore, we find the record contains other compelling evidence such that we find it was unlikely the 2018 sales data evidence influenced the jury's verdict as to either liability or damages. Thus, we hold that the admission of this evidence does not entitle Lack's to a new trial because even if it was error to admit the evidence, Lack's was not prejudiced. *See Vaught*, 366 S.C. at 480, 623 S.E.2d at 375 ("To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling *and* the resulting prejudice . . . ." (emphasis added)); *Fields*, 376 S.C. at 557, 658 S.E.2d at 86 ("Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence . . . .").

### ii. Workers' Compensation Order and Testimony

Lack's asserts the trial court erred in admitting testimony and documentation involving a workers' compensation proceeding regarding whether Lack's employees should be classified as lifeguards for purposes of workers' compensation premiums and that the admission of such evidence warrants a new trial. It argues this was improper impeachment evidence because the issue in the 2002 proceeding was how often Lack's employees engaged in high-risk lifeguarding activities like going into the ocean to rescue someone, not what their job responsibilities were. Thus, Lack's asserts the evidence "only served to mislead and confuse the jury." We disagree.

"To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice . . . ." *Vaught*, 366 S.C. at 480, 623 S.E.2d at 375. We find this evidence was relevant to Abel's overarching theme of the case—Lack's focus on dual-role lifeguarding and how that focus influenced the actions of its employees. *See Hamilton*, 344 S.C. at 354, 543 S.E.2d at 591 ("Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears."). Further, we find this evidence was not unfairly prejudicial and did not mislead the jury. *See Fields*, 376 S.C. at 557, 658 S.E.2d at 86 ("Prejudice is a reasonable probability that the jury's verdict was influenced by the challenged evidence . . . ."). There was a plethora of testimony regarding the dual-role issue and the competing responsibilities of the lifeguards. *See State v. Taylor*, 333 S.C. 159, 172, 508 S.E.2d 870, 876 (1998) ("[T]he materiality and prejudicial character of the error must be determined from its relationship to the entire case."). Although Lack's asserted at trial that its employees had "a responsibility to perform lifeguard duties 100% of the time," the documentation from the workers' compensation

proceeding revealed Lack's took a contrary position in that case and asserted its employees "perform their beach chair concession duties 99.995% of the time and that the lifeguard duties only have the potential to be performed 0.0047% of the time." Further, Lack's owner was cross-examined regarding these statements and had the opportunity to thoroughly flesh out Lack's contention that its position in 2002 was not inconsistent with its position at trial. *See, e.g.*, *State v. Joseph*, 328 S.C. 352, 491 S.E.2d 275 (Ct. App. 1997) (explaining discrepancies in testimony reflect upon the credibility of contested evidence, not its admissibility). Accordingly, the trial court did not err in admitting this evidence, and we affirm its denial of a new trial on this issue.

### iii. Communications with USLA

Lack's next argues the trial court erred in failing to grant a new trial because it improperly admitted evidence and testimony regarding Lack's history with USLA, including correspondence from 1996 and 2007. It asserts Abel's presentation of the evidence "conflated USLA certification with training in accordance with USLA standards." It also argues Abel did not produce any evidence that USLA certification was the applicable standard of care and certification was not required by the Franchise Agreement. We disagree.

"To warrant reversal based on the admission or exclusion of evidence, the appellant must prove both the error of the ruling and the resulting prejudice . . . ." *Vaught*, 366 S.C. at 480, 623 S.E.2d at 375. We find this evidence was relevant to whether Lack's was on notice that its dual-role lifeguarding violated an accepted standard of care in the industry and whether its training complied with the requirements of the Franchise Agreement, which stated lifeguards must "[s]uccessfully complete a course consisting of not less than 40 hours in open water life saving, *which [met] the criteria of the [USLA]*." *See Hamilton*, 344 S.C. at 354, 543 S.E.2d at 591 ("Evidence is relevant if it tends to establish or make more or less probable some matter in issue upon which it directly or indirectly bears."). Indeed, we find this evidence was highly relevant to one of the central issues in the case—Lack's knowledge of the dangers of dual-role lifeguarding. *See State v. Gray*, 408 S.C. 601, 610, 759 S.E.2d 160, 165 (Ct. App. 2014) ("[A] court analyzing probative value considers the importance of the evidence and the significance of the issues to which the evidence relates."); *id.* ("The evaluation of probative value cannot be made in the abstract, but should be made in the practical context of the issues at stake in the trial of each case."); *State v. Bratschi*, 413 S.C. 97, 115, 775 S.E.2d 39, 48 (Ct. App. 2015) ("All evidence is meant to be prejudicial; it is only *unfair* prejudice which must be avoided." (quoting *State v. Gilchrist*, 329 S.C. 621, 630, 496 S.E.2d 424, 429 (Ct. App. 1998))); *State v.*

*Hawes*, 423 S.C. 118, 129, 813 S.E.2d 513, 519 (Ct. App. 2018) ("Unfair prejudice means an undue tendency to suggest a decision on an improper basis." (quoting *State v. Lyles*, 379 S.C. 328, 338, 665 S.E.2d 201, 206 (Ct. App. 2008))). We hold the trial court did not err in admitting this evidence, nor was the evidence unfairly prejudicial to Lack's, and we affirm the trial court's denial of a new trial on this issue. *See Hamilton*, 344 S.C. at 357, 543 S.E.2d at 593 ("A trial [court]'s decision regarding the comparative probative value and prejudicial effect of evidence should be reversed only in 'exceptional circumstances.'" (quoting *United States v. Green*, 887 F.2d 25, 27 (1st Cir. 1989))).

## 2. Punitive Damages

Lack's argues the trial court erred in refusing to grant a new trial absolute as a result of the jury's $7-million-dollar punitive damages award because Abel "did not identify any willful, wanton, or reckless action by Lack's." It further asserts that because Lack's presented evidence that it had a negative net worth, the punitive damages award amounts to "economic bankruptcy" and demonstrates the jury had an improper motive.[6] We disagree.

"The trial court has sound discretion when addressing questions of excessiveness or inadequacy of verdicts, and its decision will not be disturbed absent an abuse of discretion." *Dillon v. Frazer*, 383 S.C. 59, 63, 678 S.E.2d 251, 253 (2009). "When considering a motion for a new trial based on the inadequacy or excessiveness of the jury's verdict, the trial court must distinguish between awards that are merely

---

[6] Lack's also argues it is entitled to a new trial because the trial court erred by permitting the issue of recklessness to be tried during the liability phase of the trial, and its requested instructions on bifurcation were rejected. However, Lack's acknowledges it "agreed to a verdict form containing a finding of whether Lack's had been 'reckless' in the first phase." It nonetheless contends the trial court should have instructed the jury of the consequence of such a finding—i.e., that a second phase of the trial would follow. We hold this issue is not preserved for this court's review because Lack's consented to the jury determining recklessness during the first phase of the trial. Further, Lack's cites no support for its contention that the jury was required to be instructed that a finding of recklessness would result in a second phase of trial to assess whether Abel was entitled to punitive damages. *See Mead v. Beaufort Cnty. Assessor*, 419 S.C. 125, 139, 796 S.E.2d 165, 172-73 (Ct. App. 2016) ("When an appellant provides no legal authority regarding a particular argument, the argument is abandoned and the court can decline to address the merits of the issue.").

unduly liberal or conservative and awards that are actuated by passion, caprice, prejudice, or some other improper motive." *Id.* at 64, 678 S.E.2d at 253. "The trial court must set aside a verdict only when it is shockingly disproportionate to the injuries suffered and thus indicates that passion, caprice, prejudice, or other considerations not reflected by the evidence affected the amount awarded." *Welch v. Epstein*, 342 S.C. 279, 302, 536 S.E.2d 408, 420 (Ct. App. 2000). "In other words, to warrant a new trial absolute, the verdict reached must be so 'grossly excessive' as to clearly indicate the influence of an improper motive on the jury." *Becker v. Wal-Mart Stores, Inc.*, 339 S.C. 629, 635, 529 S.E.2d 758, 761 (Ct. App. 2000) (quoting Rush v. Blanchard, 310 S.C. 375, 379, 426 S.E.2d 802, 805 (1993)).

"The issue of punitive damages must be submitted to the jury if more than one reasonable inference can be drawn from the evidence as to whether the defendant's behavior was reckless, willful, or wanton." *Welch v. Epstein*, 342 S.C. 279, 301, 536 S.E.2d 408, 419 (Ct. App. 2000). Further, "the '*economic bankruptcy* ' factor is *not* an absolute bar to the imposition of punitive damages in South Carolina." *Id.* at 309, 536 S.E.2d at 424.

As discussed throughout this opinion, we find there was plentiful evidence that Lack's repeatedly and knowingly breached the standard of care for professional lifeguards in multiple ways; thus, we find there was sufficient evidence to submit the issue of punitive damages to the jury. Other than unsupported assertions that the size of the award alone indicates an impropriety, Lack's points to no evidence of any improper motive or prejudice by the jury. Thus, we affirm the trial court as to this issue.

### 3. Survival Award

Lack's next contends the trial court should have granted its motion for a new trial because of insufficient evidence of conscious pain and suffering and because the $3.73 million survival award was so excessive that it "demonstrated the jury's motivations of passion and prejudice." It cites to five cases from around the country between 1978-2021, none of which awarded an amount (adjusted for inflation) higher than $135,000, and one of which awarded $0.[7] This list is, of course, not exhaustive and not persuasive. A more recent South Carolina case held

---

[7] As to Lack's arguments regarding the evidence of conscious pain and suffering, we have thoroughly addressed that issue, *supra*, and for the same reasons, we affirm the trial court on this ground.

that a new trial absolute was not warranted in a medical negligence action in which the jury awarded $1.2 million in actual damages. *See Hamilton v. Reg'l Med. Ctr.*, 440 S.C. 605, 637-38, 891 S.E.2d 682, 699-700 (Ct. App. 2023), *cert. denied*, S.C. Sup. Ct. order filed May 1, 2024. In that case, the hospital argued "little testimony was given regarding any pain and suffering" and "the size of the verdict alone [was] sufficient to show that the jury must have been moved by passion or prejudice. *Id.* at 637, 891 S.E.2d at 699. Our court rejected those contentions, noting that "appellate courts give great deference to the trial court because the trial court 'possesses a better-informed view of the damages than' [the] appellate court." *Id.* at 638, 891 S.E.2d at 700 (quoting *Vinson*, 324 S.C. at 405-06, 477 S.E.2d at 723)). Accordingly, we affirm.[8] *See Scott v. Porter*, 340 S.C. 158, 170, 530 S.E.2d 389, 395 (Ct. App. 2000) ("Appropriate damages in survival actions include those for medical, surgical, and hospital bills, conscious pain, suffering, and mental distress of the deceased."); *Mims v. Florence Cnty. Ambulance Serv. Comm'n*, 296 S.C. 4, 7, 370 S.E.2d 96, 99 (Ct. App. 1988) ("The amount of damages a jury may award for physical pain and suffering and for mental pain and suffering is

---

[8] Lack's raised several other issues that are not preserved for our review. First, Lack's argues the trial court improperly denied its motion for a new trial because of the jury's alleged confusion over the applicability of the mortality tables to the survival award. Lack's asserts that the trial court "mischaracterized" its position in its order on the post-trial motions, which found Lack's failed to timely object. However, Lack's did not file a Rule 59(e) motion as to that order, and therefore, its argument is not preserved for our review as it never obtained a ruling on the merits. *See I'On, L.L.C. v. Town of Mt. Pleasant*, 338 S.C. 406, 422, 526 S.E.2d 716, 724 (2000) ("If the losing party has raised an issue in the lower court, but the court fails to rule upon it, the party must file a motion to alter or amend the judgment in order to preserve the issue for appellate review."); *Nelums v. Cousins*, 304 S.C. 306, 307, 403 S.E.2d 681, 681-82 (Ct. App. 1991) (explaining an issue was not preserved for appellate review because "the trial court was never afforded the opportunity to rule on the clarity of its order" when the appellant failed to file a Rule 59(e) motion). Next, Lack's argues the trial court erred in failing to grant a new trial on the wrongful death claim because the award was excessive and the "return of a verdict even higher than what [Abel]'s counsel suggested" demonstrated the improper motives of the jury. We hold this issue was abandoned as Lack's does not cite any authority, or even to the record, to support its argument. *See Glasscock, Inc. v. U.S. Fid. & Guar. Co.*, 348 S.C. 76, 81, 557 S.E.2d 689, 691 (Ct. App. 2001) (holding that "short, conclusory statements made without supporting authority are deemed abandoned on appeal and therefore not presented for review").

incapable of exact measurement and is therefore left for determination by the jury.").

## POST-JUDGMENT REVIEW OF PUNITIVE DAMAGES

Lack's asserts the trial court erred in upholding the jury's award of punitive damages. We disagree.

"While states possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417. In determining the constitutionality of an award of punitive damages, appellate courts must consider: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual and potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Mitchell, Jr. v. Fortis Ins. Co.*, 385 S.C. 570, 585, 686 S.E.2d 176, 184 (2009) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). "In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Campbell*, 538 U.S. at 426.

"[O]ur appellate courts must conduct a de novo review when evaluating the constitutionality of a punitive damages award." *Mitchell*, 385 S.C. at 583, 686 S.E.2d at 183. However, this does not mean this court "conduct[s] a de novo review of the jury's determination of the proper amount to award as punitive damages." *Hollis v. Stonington Dev., LLC*, 394 S.C. 383, 405, 714 S.E.2d 904, 915 (Ct. App. 2011). Thus, "[i]f we find the jury's award unconstitutionally excessive," we may not substitute our own judgment and "set the amount we believe to appropriate." *Id.* at 405, 714 S.E.2d at 915. Instead, "we may reduce it only to the upper limit of what would be acceptable under due process." *Id.*

### 1. Reprehensibility

Lack's argues its conduct was not reprehensible and that four of the five factors that courts must examine in determining reprehensibility weigh in its favor.

Courts reviewing a punitive damages award should first "consider the degree of reprehensibility of the defendant's conduct." *Mitchell*, 385 S.C. at 587, 686 S.E.2d

at 185.  "Reprehensibility is '[p]erhaps the most important indicium of the reasonableness of a punitive damages award.'"  *Id.* (quoting *Gore*, 517 U.S. at 565).  In analyzing the reprehensibility factor,

> a court should consider whether: (i) the harm caused was physical as opposed to economic; (ii) the tortious conduct evinced an indifference to or a reckless disregard for the health or safety of others; (iii) the target of the conduct had financial vulnerability; (iv) the conduct involved repeated actions or was an isolated incident; and (v) the harm was the result of intentional malice, trickery, or deceit, rather than mere accident.

*Id.* at 587, 686 S.E.2d at 185.

We find that these factors indicate a moderate degree of reprehensibility.  First, it is undisputed that the harm in this case was physical—indeed, it resulted in the complete loss of Wolde's life.  Second, as discussed above, there is evidence to support a finding that Lack's acted with indifference or recklessness in disregarding the safety of others through its inadequate training, the use of dual-role lifeguards, and its understaffing on the day of the incident.  Moreover, we find the conduct at issue here involved repeated actions by Lack's.  Testimony indicated Lack's practiced dual-role lifeguarding for many years and routinely understaffed the beach, particularly during lunch hours when lifeguards in neighboring stands were expected to cover additional area for those on their lunch break.  *See Gore*, 517 U.S. at 577 ("Our holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance."); *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462 n.28 (1993) (noting that courts should look to "the existence and frequency of similar past conduct" in determining whether an award was excessive (quoting *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 21-22 (1991))).  We therefore affirm the trial court's finding that the reprehensibility factor was satisfied.[9]

---

[9] Lack's also argues the trial court should have considered the remaining factors articulated in *Gamble v. Stevenson*.  *See* 305 S.C. 104, 111-12, 406 S.E.2d 350, 354 (1991) ("[T]o ensure that a punitive damage award is proper, the trial court shall conduct a post-trial review and may consider the following: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award

## 2. Ratio of Punitive Damages to Actual Damages

Lack's acknowledges that the ratio factor is less than 1:1 in this case, but it argues this factor alone "cannot be used to justify excessive punitive damages when the actual damages award is excessive." We find this factor supports the constitutionality of the punitive damages award.

The second factor courts should consider in reviewing a punitive damages award is "the disparity between the actual or potential harm suffered by the plaintiff and the amount of the punitive damages award." *Mitchell*, 385 S.C. at 587-88, 686 S.E.2d at 185. "The ratio of actual or potential harm to the punitive damages award is 'perhaps the most commonly cited indicium of an unreasonable or excessive punitive damages award.'" *Id.* at 588, 686 S.E.2d at 185 (quoting *Gore*, 517 U.S. at 580). "[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell*, 538 U.S. at 425.

Here, the jury awarded approximately $13 million in compensatory damages and $7 million in punitive damages; thus, the punitive damages award is just over half of the compensatory award, well within *Campell*'s "single-digit ratio." *See id.*

Overall, we hold the *Mitchell* and *Gore* factors weigh in favor of the constitutionality of the punitive damages award, and we affirm the trial court as to this issue.[10] [11]

---

will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) . . . 'other factors' deemed appropriate."). However, the *Mitchell* court expressly held "that *Gamble* remains relevant to the post-judgment due process analysis . . . only insofar as it adds substance to the *Gore* guideposts." 385 S.C. at 587, 686 S.E.2d at 185. We find the analysis set forth in *Mitchell* and *Gore* is sufficient in this instance.

[10] The parties appear to agree that there are no directly comparable civil penalties or cases. Thus, this factor is neutral regarding the constitutionality of the punitive damages award. *See Mitchell*, 385 S.C. at 588, 686 S.E.2d at 186 ("Third, the court should consider the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.").

[11] Lack's also argues the trial court failed to consider all of the factors required by section 15-32-520(E) of the South Carolina Code (Supp. 2024). We note that

**CONCLUSION**

Based on all of the foregoing, the judgment of the trial court is **AFFIRMED.**

**WILLIAMS, C.J., and GEATHERS, J., concur.**

---

Lack's filed a Rule 59(e) motion regarding the trial court's November 28, 2022 Order on Post-Trial Review of Punitive Damages Award and raised this issue; however, there is no order ruling on that motion in the record and it is unclear whether one was ever issued or if the motion remains pending in the trial court. Accordingly, we decline to address this issue. *See Matter of Est. of Moore*, 435 S.C. 706, 715-16, 869 S.E.2d 868, 872-73 (Ct. App. 2022) (noting the appellant "bears the burden of providing a sufficient record on appeal from which this court can make an intelligent review" and declining to address an issue for which the appellant failed to include relevant documents in the record).